## Case No. 14,678.

### UNITED STATES v. BUCHANAN.

[Crabbe, 563.] [1]

District Court, E. D. Pennsylvania. June 4, 1845.

NAVY—DUTIES AND EMOLUMENTS OF PURSERS— USAGE—SET-OFF.

1. In 1839–40 there was no act of congress expressly defining the duties or emoluments of pursers in the navy, or the quantity and kind of stores to be provided by them; those points were regulated by the rules of the navy, by orders from the navy department, and by usage and custom.

2. The commander of a vessel of war has a right to issue and enforce orders as to the discipline of his ship, and on this principle, may control the issue of stores by the purser, but not vary their price.

3. The "red book" of 1832 did not restrain pursers to ten per cent. advance on their private stores, but suspended the "blue book" rule to that effect.

4. An usage, to be binding in the navy, must be uniform, and applicable to all officers of the same grade under similar circumstances.

5. No change of usage, even by authority, can have a retrospective effect, but must be limited to the future.

6. Acts of a government agent, not previously authorized, but subsequently ratified by government, render the latter responsible for any loss occasioned thereby.

7. Unliquidated damages arising from torts may be set off against a government claim; but such damages can only include actual loss, not anticipated profits

This was an action of debt, on an official bond, to recover the sum of $11,535 50, alleged to be due from [M'Kean Buchanan]

1 [Reported by William H. Crabbe.]

the defendant to the plaintiffs. It appeared that the defendant was a purser in the navy of the United States. In 1839, he was ordered to the frigate Constitution, then about to sail for the Pacific under command of Captain Turner, and being the flag-ship of Commodore Claxton. The usual stores, including private stores of fine clothing, &c., were laid in by the defendant, and served out to the crew at various rates of advance; that on government stores, or "slops," being ten per cent., and on the private stores, which the purser was then allowed, and indeed expected to take on board, twenty-five or fifty per cent., according to the description of the article. A purser's absolute pay at that time was forty dollars per month, but he was allowed these percentages in addition. In 1840, Commodore Claxton issued a general order to the squadron under his command, that, until the decision of the navy department was known, all private stores of clothing, when issued, should be charged as slops, that is, at an advance of ten per cent., and stated in this order that it was founded on the directions of the "blue book," or book of regulations for the navy, published in 1818, the following being the parts thereof referred to: Page 102, § 13: "The purser shall be authorized to dispose of the slops to the crew at a profit of ten per cent." Page 103, § 14: "All articles of wearing apparel, or materials of which wearing apparel is made, to be charged as slops."

The defendant protested against this order, but was obliged to submit to it, and it was confirmed by the secretary of the navy. In order to test the defendant's right to be credited with his loss arising from the order in question, and also to other credits which he claimed, this suit was brought; the amount sued for by the plaintiffs being, as before stated, $11,535.50, and interest; and the credits claimed by the defendant in his affidavit of defence being as follows:

| | |
|---|---:|
| Commission for drawing bills of exchange | $ 1,601 86 |
| Commission on payments at Navy Yard, Pensacola | 1,955 61 |
| Loss of commissions and depreciation of property | 9,360 31 |
| Loss of commissions on sale of slops | 385 52 |
| | $13,303 30 |

On the trial these credits were varied by the evidence, and went to the jury in the following form:

| | |
|---|---:|
| Commission on bills of exchange... | $ 1,626 85 |
| Commission on payments at Pensacola | 2,275 38 |
| Loss of commissions and depreciation of property.. | 9,360 31 |
| | $13,262 55 |

—Or $1,727.05 more than the amount of the plaintiffs' demand. The defendant made no claim for interest.

The case came on for trial, before Judge RANDALL and a special jury, on the 4th June, 1845, and was argued by Watts, Dist.

Atty., for the United States, and by G. M. Wharton and Mr. Dallas, for defendant.

G. M. Wharton, for defendant.

A party having claims against government, has but one of two courses to adopt: either to apply to congress for relief, which is attended with trouble, expense, and inconvenience; or, if he is fortunate enough to hold government funds, to force them to sue him, and then give his claims as a set-off to their demand. This latter course has been adopted by the defendant, and has produced the present suit. The defendant was under a contract with the plaintiffs. In return for his services he was to receive his pay and rations, and also the special emoluments of his office. This contract has been broken, and the principal item of the defendant's claim is a remuneration for the damage he has incurred thereby. The act which caused this damage was that of an authorized agent of the plaintiffs, and was subsequently sanctioned by them; we therefore claim to hold the United States responsible for the consequences. The compensation of a purser, in 1839 and 1840, was composed of several items. He received a fixed pay of $40 per month and his rations, and he also received a percentage on the first cost of the stores served out by him, and on some few other matters. This percentage varied with the article on which it was charged. On coarse government clothing, or slops, and the material thereof, it was fixed, by the "blue book," at ten per cent.; but by the usage of the navy, sanctioned by the "red book" of regulations of 1832, pursers were permitted—indeed, by the evidence, it was their duty—to take to sea, on their private account, other and finer articles of clothing, and the comforts and luxuries of life, for which they were authorized to charge an advance of twenty-five or fifty per cent. on the respective costs. These charges, of ten, twenty-five, and fifty per cent. advance, were part of the compensation of a purser, and the act of 26th August, 1842 (5 Stat. 535), under which those officers are now paid a fixed salary, without percentages, is an express recognition that those charges formed one of the items of a purser's pay before that date, and government went so far to sanction this practice, that they advanced the money to enable pursers to lay in these private stores. Congress alone could alter that pay, and no authority to do so rested either in the secretary of the navy, or the commissioners. The red book settles this matter beyond question, and the authority of that book cannot be impugned. It was communicated to the officers of the navy, officially, by the secretary, and they were ordered by him to "take it as their guide, * * * after its receipt;" and, at p. 18, it directs that twenty-five per cent. may be charged on "articles of secondary necessity," and fifty per cent.

on "luxuries." The meaning of the words "secondary necessity" is to be explained by the usage of the service, and the evidence shows that by the usage it covers the fine clothing included by Commodore Claxton's order; but as that clothing had been laid in under the sanction of the secretary's order, and under the guarantee of the red book, no commodore, and no secretary assuming a commodore's order as his own, could rescind that order so as to affect or prohibit the sale of goods purchased under it. We therefore think that our main item of $9,360.31 is a valid claim against government.

We claim also for extra services and risk in drawing bills of exchange between 1827 and 1830. It was not part of a purser's regular duty to draw these bills, and, till the act of 3d March, 1835,—4 Story's Laws, 2411 [4 Stat. 755],—commanders received this same allowance of two and a half per cent. therefor. The evidence also shows that such allowances have been made to some other pursers. The claim for a percentage on payments made to mechanics and laborers at the Pensacola navy yard, rests on similar grounds. The same allowance has been shown by the evidence to have been made to other pursers; and it is no part of a purser's regular duties to pay those who are not enlisted in the naval service.

Mr. Watts, U. S. Dist. Atty.

The starting-point of this case is the claim of $11,535.50, with interest from 1st March, 1844, by the plaintiffs. In answer to this, the defendant alleges certain credits which he thinks himself entitled to, amounting, in all, to $1,727.05 more than the plaintiffs' demand. Though the defendant claims these credits against the United States as a set-off, his claim is really in the nature of a cross action for $13,262.55, and he must be held to strict and clear proof of that sum. The main item of the defendant's claim arises from the order of Commodore Claxton, directing him to charge his private stores of clothing as slops; and the line of argument taken to justify this item, makes it necessary to have a thorough understanding as to what the position of a purser in the navy really is.

By the act of 18th April, 1814,—2 Story's Laws, 1427 [3 Stat. 136],—providing for the pay and subsistence of officers, a purser is put on an equality with chaplains and sailing-masters, and nearly so with lieutenants. It became necessary to lay in government stores, and in the course of time it grew to be the custom for pursers to purchase private stores with money advanced by government. By the act of 7th February, 1815,—2 Story's Laws, 1496, 1497 [3 Stat. 202],—the president was authorized to appoint three officers of the navy, a board of commissioners, who should have power, with the consent of the secretary of the navy, to adopt rules and regulations for the service, which

were to be enforced and obeyed till altered by the same authority. These rules were adopted, and published in the blue book, in 1818; they have all the force of law, and cannot be altered or repealed but by similar law. Under those rules (pages 102, 103), all articles of wearing apparel, and the materials to make the same, are to be served out at an advance of ten per cent. on their cost. Under this state of affairs the defendant sets up his claim for cross credits, to reduce the government demand and to make it his debtor, and for a foundation to his claim he relies on a contract insisted to exist between himself and the government, and regulated by usage and the red book. On this contract the defendant's whole case depends, for if there is no contract, there can be no breach, no damages, no set-off. But there can be no contract, for if there is it must be binding on both parties, while here each may rescind it at will and in a moment. If the defendant's office created a contract with the United States. so must all offices under government: a doctrine contrary to the whole spirit of our institutions, and not for a moment tenable. If there is a contract, the officers of government are a privileged order, perfectly supreme, not under the control of their superiors, and endowed with certain vested rights not to be impaired even by congress. Every approach to such results has been carefully barred by the decisions of our courts. Ex parte Hennen, 13 Pet. [38 U. S.] 258, 259: Com. v. Sutherland, 3 Serg. & R. 145; Marbury v. Madison, 1 Cranch [5 U. S.] 137; Bowerbank v. Morris [Case No. 1,726].

Even if a contract existed, there can be no set-off on the facts of this case, for, according to the defendant's own argument, the damage arose from the wrongful acts of officers or agents of government, for which the latter can on no principle be held liable. Work v. Hoofnagle, 1 Yeates, 506; Burke v. Trevitt [Case No. 2,163]; Johnson v. U. S. [Cases Nos. 7,419 and 7,420]; U. S. v. Lyman [Case No. 15,647]; Mallery v. Shattuck, 3 Cranch [7 U. S.] 483. Beside, there are unliquidated damages arising from torts, which are not a legitimate ground of set-off. Gogel v. Jacoby, 5 Serg. & R. 122; Cornell v. Green. 10 Serg. & R. 14; Heck v. Shener. 4 Serg. & R. 249; U. S. v. Robeson, 9 Pet. [34 U. S.] 323; Meredith v. U. S., 13 Pet. [38 U. S.] 492, 493; Winchester v. Hackley, 2 Cranch [6 U. S.] 342; Com. v. Matlack, 4 Dall. [4 U. S.] 303; U. S. v. Wells [Case No. 16,663]. Neither can prospective profits, or depreciation of property, be charged against the government. Monongahela Nav. Co. v. Fenlon. 4 Watts & S. 205, 214. This alleged contract is endeavored to be supported by usage. and by the red book. We have seen that under the acts of 1814 and 1815, and the blue book, the law is not in accordance with the defendant's views, and when the law upon a particular subject is positive no evidence of contrary usage can be received. Brown v. Jackson [Case No. 2,016]; Collings v. Hope [Id. 3,003]; U. S. v. Duval [Id. 15,015]; Stoever v. Whitman, 6 Bin. 417. While the red book itself (page 49, and note) proves that the blue book was not rendered obsolete by the publication of the former.

This claim for depreciation and loss of commissions, is not an equitable one, and therefore not within the law allowing equitable set-offs. Act March 3, 1797,—1 Story's Laws, 465 [1 Stat. 512]. It is inequitable, because it assumes that government, after having advanced to the defendant, without interest, the money to purchase his private stores, guaranteed that they should all be sold at an advance of twenty-five or fifty per cent.; because it charges loss on goods voluntarily sold by the defendant, or used by him; because it charges loss on all the articles of defendant's stores, while Commodore Claxton's order only covered wearing apparel and its materials; and because it charges depreciation of value on account of the goods remaining unsold, when the only possible effect of the order reducing their price would have been to increase the sale. It is therefore submitted that the claim to set off $9,360.31, is not admissible on any ground.

The defendant claims to set off $1,626.85, being his commissions at two and a half per cent., for drawing bills of exchange while abroad, from 1827 to 1830. There is no law to authorize this charge. Drawing such bills was part of his duty as purser (red book, p. 51), and all such allowances ceased after the 9th November. 1826, according to the instructions of the secretary of the navy of that date. Usage is again invoked to support this claim, but even if it could be admitted that usage should vary positive law, which we have already seen is not admissible, the evidence should show that usage to be uniform and undeviating, which is not the case here.

The claim for the remaining set-off of $2,275.38, for commissions on payments at Pensacola, from 1835 to 1837, is, at least, equally untenable. Those payments were part of the defendant's regular duty (blue book, p. 8), and extra allowances therefore are prohibited by the pay-bill of 3d March, 1835,—4 Story's Laws, 2413 [4 Stat. 755].

Mr. Dallas, for defendant, in reply:

The jury is substituted for the accounting officers of government; its province is to decide simply on the conflicting claims of the parties before the court, and it is not to be led off to any collateral issues. The plaintiffs have claimed $11,535.50, while the defendant demands $1,727.05; these two sums, and the items which make them up, are the limits of the question which this jury is to decide. The question then arises as to what principles, laws, usages, or practices, must regulate the decision. By what

is the naval service governed? Not by the will of the executive; not by any single written code; not by the whims or caprices of the several officers; but by the constitution of the United States, and the acts of congress; by the regulations, orders, and decisions emanating from the commander in chief, or the navy department, and by the customs or usages of the service. These, taken together, form the body of law, written and unwritten. Codification, in the shape of orders and regulations, has been effected, to a certain extent by the act of 23d April, 1800,—1 Story's Laws, 761 [2 Stat. 45],—the blue book, and the red book, but after all this, a vast portion of naval law is still, necessarily, to be found only under the broad head of custom. The act of 1800, recognises custom generally, and so does the universal practice of courts martial; the blue and red books contain but a skeleton of the general regulations of the service, although the latter of these contains many things not in the former. As to the authority of the red book, we conceive it to be at least equal to that of the blue book. Its nature, contents, source, title, the order which prefaces it, its being distributed throughout the service, and its full recognition by the evidence before this court, entitle it to be considered as of full authority for the settlement of the question here involved.

The first of the defendant's credits is for commissions on bills of exchange, drawn by him during the years 1827, 1828, and 1829. They were drawn when abroad, by authority of his commander, at the personal risk of the defendant in case of their protest; they realised a premium of six per cent., their proceeds were all applied to government service, and they were all honored by government. On principle, the defendant was clearly entitled to an extra allowance on this account, as he had performed an extra service and incurred an extra risk; and in practice, as appears by the evidence, such allowances have been made both to commanders and to pursers. The fact of there being but few cases of this allowance to pursers only shows the rarity and unusual character of the service, and were this the first and only case of such a claim by a purser, which it is not, the same principle which justified the allowance to commanders should give it to pursers. It is said that these allowances ceased after the 9th November, 1826; but at that date the defendant was on a foreign station, too remote from navy agents to obtain the necessary funds in any other way, and could not be aware of a change of system contained in a letter from the secretary of the navy to the fourth auditor of the treasury.

The next credit claimed, is for commissions on payments to mechanics and laborers at the navy yard, Pensacola. The evidence shows many cases of such allowances to pursers, and the principle of them is very evident; such payments are not within the legitimate line of a purser's duty; the persons paid do not belong to the navy, and the purser is obliged to assume extra risk and responsibility, by keeping on hand a larger sum of money than he otherwise would.

The third and chief item of our claim, is for the profits, &c., of which the defendant was deprived by the unjust and illegal interference of the plaintiffs with his rights. In regard to this claim, the evidence shows that, by long-established and uniform custom, the purser was bound to lay in his private stores, purchased with money advanced by government, which stores have always been known as "articles of secondary necessity," or as "luxuries," and have never been confounded with public supplies, either in the commission on their sale, or the responsibility on their loss or damage; that the defendant pursued, in all respects, the customary course as to his stores; that Commodore Claxton seized, or prevented the sale of these stores, defeated the established custom, debarred the defendant of his rights, and induced the plaintiffs to assume these illegal acts.

We therefore claim to set off a total sum of $13,262.55, or $1,727.05 more than the plaintiffs' demand.

RANDALL, District Judge (charging jury). Although, in form, this is an action brought by the United States to recover from the defendant an alleged balance, under his official bond as a purser in the navy, in reality, the only inquiry is the validity of a claim by the defendant against the government, consisting of three items, for which he claims credit, and which have been rejected by the proper accounting officers. As no action can be maintained by an individual against the United States, the only remedy for a claimant whose accounts have been rejected, is either to apply to congress, or, by retaining money of the government in his hands to compel the United States to commence a suit against him, and then his whole demand may be examined by way of a set-off, or equitable defence, provided it has been previously presented to the treasury department, and has there been disallowed. These preliminary proceedings having been had, let us examine the items of the claim, and the evidence adduced in their support.

The principal item is a claim for a loss of commission, or depreciation in the value of property purchased by the defendant as part of the stores for the U. S. ship "Constitution," to which he was ordered as purser. In March, 1839, the defendant joined that vessel at Norfolk, she being then commanded by Captain Turner, and the flag ship of Commodore Claxton, the commander of the squadron intended for the Pacific. At Norfolk, and at New York, he purchased a supply of such stores, and other articles, as were usually purchased by pursers for the

officers and crew; the government furnishing such articles as were of primary necessity, and the remainder being purchased by the defendant with moneys provided by the government, the articles remaining at his risk. There is no act of congress expressly defining the duties or emoluments of the purser, or the quantity or kind of stores necessary to be provided by him; these are settled by the rules and regulations of the navy, by orders from the navy department, and by usage or custom.

It does not appear that any complaint was made, either by Captain Turner or Commodore Claxton, at the time of laying in the stores, of their quantity or price; and some of the officers prove that, considering the intended cruise, the supply was a reasonable one. A list of articles belonging to the purser, and their prices, was exhibited to the captain, approved by him, and placed in a public part of the ship soon after she proceeded to sea, by which it appeared that an advance of twenty-five per cent. was charged on articles termed of secondary necessity, and fifty per cent. on those termed luxuries. No complaint was made of these charges until the commencement of the year 1840, when, in consequence of information having been communicated to the commodore that a quantity of silk handkerchiefs had been sold by the steward of the purser (without the knowledge and in the absence of the latter) to the crew, and by them attempted to be smuggled on shore, he sent for a schedule of the ship's stores, and issued an order, dated 23d of February, 1840, by which he directed that, "until the decision of the department in the premises be known, the issue of articles of private clothing is prohibited as far as it conflicts with that of the public slops in store, and when served out, must be charged at a profit of ten per cent."

The defendant immediately remonstrated against the propriety of this order, as being contrary to usage, but, on the commodore insisting on its enforcement, he was obliged to submit. It is admitted that by "private clothing" the clothing purchased by the purser, and remaining at his risk, is intended; and that it has been customary and usual, and by some of the witnesses considered the absolute duty of the purser, to provide such articles for the use of the men. That the commander of a vessel of war has a right to issue orders in relation to the discipline of his ship and the conduct of his officers on board, and to enforce those orders, there can be no doubt. It is a necessary part of discipline that such power should be vested in him, he being responsible for any abuse of it. It is also his right to control the issue of stores by the purser, and, if he thought the interests of the government or of the crew required it, to restrict the issue of such stores to a proper quantity; but he has no right to reduce or control the prices at which such stores are to be issued, that being fixed by the rules and regulations, and the usage and customs of the navy. Was there a fixed price or rate of advance which the purser had a right to charge on these articles? If so, what was it? And was it changed by the order of Commodore Claxton? On behalf of the United States it is contended that the rules and regulations prepared by the board of navy commissioners, and published in 1818, were in full force, and that by these "all articles of wearing apparel, and materials of which wearing apparel is made," were "to be charged as slops," and an advance of ten per cent. only allowed. It is admitted that so far as these rules and regulations are not opposed to the acts of congress, or to subsequent rules and regulations, they are in force; it is contended, however, that these do not extend to the private stores of the purser, but only to those purchased by government, or, if they do so extend, that the rule is superseded by the regulations issued in 1832, which were in full force in 1839-'40.

I deem it unnecessary to detain the jury by an examination of the first view, as I think the last is correct. Although the rule or section referred to in the red book, on the face of it, purports to bear date on the 27th July, 1809, and may have been suspended by the rules of 1818 (as to which, however, it is unnecessary to decide), I consider the incorporation of it in the rules of 1832 as a new issue of that date, and binding from the time of its promulgation, although it may conflict with the rules of 1818. Each successive secretary, or head of a department, has the same right as his predecessor to give a construction to the laws, regulations, or usages, of the business of his department, and the construction given to the last will be binding until changed or altered by a successor. U. S. v. McDaniel, 7 Pet. [32 U. S.] 14. This construction of the rules of 1832 has been adopted not only by the accounting officers of the government, but by congress. Act for the relief of E. B. Babbit, 2d March, 1833 [6 Stat. 548]. The rules of 1832 provide (page 18) that twenty-five per cent. should be allowed on articles of secondary necessity; are these articles of private clothing, and materials of which such clothing is made, within that term? This is a question for the jury. From the evidence it appears that the articles furnished by the purser are of a finer material than those provided by the government, and have generally been considered in the service as a holiday or shore dress for the seamen; they are not required to purchase these private stores, but do so at their own will or desire. A number of witnesses have been examined who prove it to have been the custom and usage to charge upon these articles an advance of twenty-five per cent., and that they were considered of a secondary necessity. It is true there can be no usage recognised by the court which is contrary to law; but it is

evidence of the construction given to the law, and when the usage is established it regulates the rights and duties of those who act within its limits. U. S. v. McDaniel, 7 Pet. [32 U. S.] 14, 15.

But it is said that a different construction was given to these regulations by Mr. Secretary Paulding, and that he confirmed the views of Commodore Claxton. If the order of Commodore Claxton had been confined to supplies purchased subsequently to the receipt by him of this general order, there might have been force in this argument; but no change of usage, even by authority, can have a retrospective effect, and must be limited to the future. This construction appears to have been given to the order in relation to all the other pursers on the station, who were allowed to dispose of their stores on hand at the former prices. It is said, however, that, supposing all these doings of Commodore Claxton to have been wrong, still the government is not liable for his acts, and therefore the defendant is not entitled to this set-off, although he has sustained damage thereby. For the purposes of this case, and with a view of obtaining a verdict on the merits of this claim, I state the law to be that Commodore Claxton was the agent of the government in all this transaction, and that, although his acts may not have been previously authorized by the government, as they were afterwards ratified by the secretary of the navy, with a full knowledge of the facts, the government is responsible for any loss occasioned by his orders so ratified and confirmed.

Again, it is contended that, supposing all the allegations of the defendant to have been fully made out by the evidence, yet this is not such a claim as can be set off against the demand of the government in this action. However this might be in suits between individuals, the government of the United States does not resort to technicalities to screen it from a just claim by any of its citizens. The act of 3d of March, 1797, directs not only that legal but that equitable credits should be allowed to the debtors of the United States by the proper officers of the treasury department, and, if there disallowed, they may be given in evidence at the trial; and this whether the credits arise out of the particular transaction for which suit was brought, or any distinct or independent transaction which would constitute a legal or equitable set-off or defence, in whole or in part, to the debt sued for by the United States. U. S. v. Wilkins, 6 Wheat. [19 U. S.] 135. It is incumbent on the defendant to satisfy you what is the amount of credit to which he is entitled under this head. In estimating it you are to allow only the actual loss sustained by him, and not any prospective or anticipated profits which might have been made by the defendant, supposing his whole stock to have been sold at the prices claimed by him.

If, in consequence of Commodore Claxton's order, the goods remaining on hand were injured or damaged, he is entitled to recover the amount of such damage; but the jury will determine whether such damage was caused by the order, and whether the sales were lessened in quantity in consequence of the reduction in price. The sales made on shore, and those to other pursers, are not such as would entitle him to charge the government with the advance of twenty-five per cent. on cost, but if made bona fide, with a view to reduce an anticipated loss, he will be entitled to be made good his actual loss on such sales.

The second and third items of claim are for commissions on moneys paid by the defendant to mechanics and laborers, when stationed at the Navy Yard in Pensacola, from October, 1835, to December, 1837; and for commissions on the amount of bills of exchange drawn by him on the government from May, 1827, to February, 1830. These are alleged to be extra services for which, by the custom of the department, the defendant is entitled to extra compensation. From the rules and regulations of 1818 and 1832, as given in evidence, it appears that both the drawing of the bills of exchange by pursers, when abroad, and the payment of mechanics and laborers by them when stationed at the navy yards, were duties devolved on, and usually performed by, pursers. But if, from the evidence, the jury believe that these duties were required of, and were performed by the defendant, over and above the regular duties of his appointment, and that it has been the practice of the government, or of the navy department, to allow to pursers compensation or commission over and above their regular pay, and that the defendant took upon himself the labor and responsibility of such payments, and drawing of bills, with an understanding on both sides that he should be compensated for the same as extra services, then, it is competent for the jury to allow such sum as they may find to be reasonable, and conformable to the general usage of the government in like cases.

But custom and usage, which have been invoked by the defendant in his favor, must also operate when established against him. The usage, to be binding, must be uniform, and applicable to all officers of the same grade, under similar circumstances. It is not sufficient that one, or two, or half a dozen officers have been allowed an extra compensation for such services, unless the rule was a general one, so that each officer performing the service might be supposed to rely on the known practice of the government to allow extra compensation when the service is performed. The jury will say whether the few cases in which extra compensation is proved to have been allowed are not rather exceptions to the general rule of refusing such compensation, than proof

of the rule itself. My opinion is that the weight of the evidence is against the claim of the defendant for either of these items. I have deemed it unnecessary to enter into any examination of the amount of these claims. There is no dispute about the amount of bills drawn, or the sums paid to mechanics and laborers; the only question is as to the right to any payment or compensation for either.

NOTE. On the 25th June, 1845, the jury rendered a verdict for defendant, and granted him a certificate for $508.72; the defendant being thereby allowed the following credits:

| | |
|---|---|
| Commissions on payments at Pensacola | $ 2,275 38 |
| Interest thereon | 1,024 00 |
| Commissions on bills of exchange | 1,626 86 |
| Interest thereon | 1,455 00 |
| Loss on sales | 385 52 |
| Loss of commissions | 5,277 46 |
| | $12,044 22 |
| Deduct government claim | 11,535 50 |
| Due defendant | $ 508 72 |

On the 5th September, 1845, the defendant released the two items of interest allowed by the jury, and agreed that judgment should be entered for the plaintiffs for $1,970.28, with interest from 1st March, 1844, in all $2,479, and costs; and thereupon the court overruled a motion for a new trial, which had been made by the plaintiffs. On the 15th September, 1845, the plaintiffs took a writ of error to the circuit court of the United States for the Eastern district of Pennsylvania, wherein, on the 9th November, 1846, the judgment of the district court was affirmed; and thereupon the plaintiffs, on the 14th November, 1846, took a writ of error to the supreme court of the United States, wherein, at January term, 1850, the judgments below were reversed, and a venire de novo ordered. See 8 How. [49 U. S.] 83. The case was subsequently discontinued.